IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MONTANA
HELENA DIVISION

| | |
|---|---|
| THOMAS LONNIE RODRIGUEZ,<br><br>Plaintiff,<br><br>vs.<br><br>COLLYN SERVER,<br><br>Defendant. | CV 21–62–H–BMM<br><br><br><br>ORDER |

Plaintiff Thomas Lonnie Rodriguez, a state prisoner proceeding pro se, alleges that Defendant Collyn Server, a Housing Unit Sergeant at the Montana State Prison, used excessive force against him on August 8, 2019, in violation of the Eighth Amendment. (*See* Doc. 7.) Server seeks summary judgment on the ground that no constitutional violation occurred and, even if it had, he is entitled to qualified immunity. (Doc. 25.)

## LEGAL STANDARD

Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A fact is material if it impacts the outcome of the case in accordance with governing substantive law. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A dispute of material fact is genuine "if the

1

evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.* All reasonable inferences must be viewed in the light most favorable to the nonmoving party. *Tatum v. Moody*, 768 F.3d 806, 814 (9th Cir. 2014).

Nonetheless, the nonmoving party must identify, with some reasonable particularity, the evidence that it believes precludes summary judgment. *See Soto v. Sweetman*, 882 F.3d 865, 870 (9th Cir. 2018) (explaining that while pro se parties are exempted from "*strict* compliance with the summary judgment rules," they are "not exempt[ed] . . . from *all* compliance," such as the requirement to identify or submit competent evidence in support of their claims). Server's motion was accompanied by the requisite *Rand* Notice, (*see* Doc. 28), and Rodriguez was given additional time to respond, (*see* Doc. 29).

## BACKGROUND

The following facts are undisputed unless otherwise noted, (*see* Docs. 18, 27, 30), and viewed in the light most favorable to Rodriguez. *Tolan v. Cotton*, 572 U.S. 650, 657 (2014) (per curiam).

Plaintiff Rodriguez is incarcerated at the Montana State Prison in Deer Lodge, Montana. (Doc. 27 at ¶ 1.) At all times relevant to this action, Defendant Collyn Server was a Housing Unit Sergeant at the Prison. (*Id.* ¶ 2.) On August 8, 2019, Rodriguez asked to talk with Server about getting a sack lunch. (*Id.* ¶ 3.) Server informed Rodriguez that the sack lunches were on their way. (*Id.*)

Rodriguez then asked why he had not received a tablet. (*Id.* ¶ 4.) Server informed Rodriguez that he had missed the time to get his tablet, and Rodriguez responded with profanity. (*Id.*) Server then escorted Rodriguez back to his block and informed him that he would be locked down until 14:00 hours. (*Id.* ¶ 5.) Rodriguez again responded with profanity. (*Id.*) Server contacted Sergeant Miller in the command post and informed him that Rodriguez was going to be sent to lockup for insolence. (*Id.* ¶ 6.) Rodriguez returned to his cell where he made a cup of coffee, (Doc. 18 at 1), which he was carrying when he returned to the High Side to report to Server. (Doc. 27 at ¶ 7.)

It is at this point that the parties' recollections diverge. According to Server, he told Rodriguez that Rodriguez was being sent to locked housing for insolence. (*Id.* ¶ 8.) Rodriguez responded by saying "you're a bitch" and then Rodriguez threw his hot coffee in Server's face. (*Id.* ¶ 9.) Perceiving a threat, Server, Sergeant Andrew Shulman, and Correctional Officer Ralph Matter grabbed Rodriguez, he fell to the floor, and then Server handcuffed him. (*Id.* ¶¶ 10–11, 23–25.)

According to the officers, Rodriguez resisted the takedown and struggled against them. (*Id.* ¶ 12.) While being restrained, Rodriguez kicked Server, (*id.* ¶ 14), elbowed Shulman near his eye, and spit in Shulman's face. (*Id.* ¶ 13; *see also* Doc. 27-5 at 7 (indicating that Rodriguez said that "he did not give a fuck"

3

after hitting Shulman)). After struggling for about a minute, the officers were able to handcuff Rodriguez. (Doc. 27 at ¶¶ 15–16.)

According to Shulman, Matter had Rodriguez's left arm, Server had Rodriguez's right arm, and it was Shulman himself that completed the cuffing procedure. (Doc. 27-5 at 2.) Once restrained, Rodriguez was pulled to his feet. (*Id.*) Rodriguez was then escorted by other officers to the infirmary for a routine post-incident exam. (Doc. 27 at ¶ 17.) None of the officers recall Rodriguez saying anything about his handcuffs at the time of the incident. (*See* Doc. 27-3 at ¶ 13; Doc. 27-4 at ¶ 17; Doc. 27-5 at ¶ 13.)

Rodriguez does not dispute that he threw his coffee at Server. He describes the events differently. According to Rodriguez, Server would not listen to his "side of the story" regarding his initial allegedly insolent conduct. (*See* Docs 18, 30.) Subsequently, Rodriguez did return to his cell and make a cup of coffee, which Rodriguez insists he always drinks "cold." (*Id.*) When Rodriguez returned to High Side carrying the coffee, he and Server had a conversation about a prior incident between the two of them in 2016 where Rodriguez pressed the intercom and Server told him if he pressed it again he (Server) would come out of the cage and kick Rodriguez's "fucking ass." (*Id.*) According to Rodriguez, Server laughed at the recounting and said that he could not believe that Rodriguez remembered the incident. (*Id.*)

4

When Rodriguez said he did not think it was funny, Server stepped forward into his face. (*Id.*) Rodriguez indicated that he was scared because of prior abuse he suffered and that he "panicked" and tossed his "cold" coffee in Server's face. (*Id.*) At that point, he said the officers restrained his hands across his chest before he fell backward. (*Id.*) Rodriguez insists that it was his fall backward that caused Server to get kicked in the face; it was not an intentional strike. (*Id.*) According to Rodriguez, Server then lunged on top of him and cuffed his wrist so tightly behind his back that it cut off the circulation and left scarring. (*Id.*) Server pulled Rodriguez to his feet by his arms after Rodriguez's arms were "chicken-winged" behind him. (*Id.*) Rodriguez yelled "stop" because it felt like his arm was going to snap. (*Id.*) Ultimately Rodriguez both heard and felt a snap in his right arm. (*Id.*)

Server filled out a Disciplinary Infraction Report/Notice of Hearing reporting Rodriguez's assaults on himself and Shulman following the incident. (Doc. 27 at ¶ 19; Doc. 27-1 at 2.) Disciplinary Hearing Officer Christine Klanecky issued a Disciplinary Hearing Decision on August 13, 2019, finding Rodriguez guilty of assaulting staff. (Doc. 27 at ¶ 20; Doc. 27-1 at 3.) The decision was based on Server's Disciplinary Report and Rodriguez's own guilty plea. (*Id.*) Rodriguez signed the Decision, foregoing appeal. (*Id.*) Rodriguez was subsequently charged in the Montana Third Judicial District Court, Powell County with assault on a peace officer in violation of § 45–5–210, Mont. Code Ann. (Doc.

27 at ¶ 22; Doc. 27-2 at 2–3 (Information).)  He pled guilty on June 9, 2020, and received a consecutive two-year sentence.  (Doc. 27 at ¶ 22; Doc. 27-2 at 4–7 (Judgment).)

Rodriguez filed a grievance on November 11, 2019, (*see* Doc. 18-1 at 23), and continued to report ongoing pain in his right arm associated with the incident, (*see* Docs. 18-1 at 10, 26, 27).  *See* 18 U.S.C. § 1997e(a).  Rodriguez filed his original complaint in this Court in August 2021, (Doc. 2), and his Amended Complaint on November 4, 2021, (Doc. 7).  Rodriguez alleges in his amended pleading that Server used excessive force in violation of the Eighth Amendment when he handcuffed Rodriguez "so tight that it cut of [his] circulation to [his] hands and left cuff scars on [his] wrist."  (*Id.* at 3, 5.)

Rodriguez further alleges that his right shoulder and elbow were stretched out of their sockets when his arms were "chicken winged" and he was pulled to his feet and, since that time, have required regular cortisone shots.  (*Id.*)  Rodriguez seeks surgery for his right arm, as well as $750.00 for loss of future income and $1.5 million for punitive damages.  (*Id.* at 5.)  Rodriguez indicates in his disclosure statement that he seeks $750,000 for medical expenses, $1.5 million for punitive damages, and $100,000 for mental anguish and suffering.  (*See* Doc. 18 at 4.)  Server filed a motion for summary judgment on December 2, 2022.  (*See* Docs. 25, 26, 27.)  Rodriguez responded on January 9, 2023.  (Doc. 30.)  No reply was filed.

## ANALYSIS

Server asserts that he is entitled to summary judgment on the ground that no constitutional violation occurred and, even if it had, he is entitled to qualified immunity. Generally, a prisoner's claim asserting that prison staff used excessive force is analyzed under the Eighth Amendment. *See Hudson v. McMillan*, 503 U.S. 1, 5–6 (1992). The U.S. Supreme Court has divided this inquiry into two components: "(1) a 'subjective' inquiry into whether prison staff acted 'with a sufficiently culpable state of mind'; and (2) an 'objective component' that asked whether 'the alleged wrongdoing was objectively harmful enough to establish a constitutional violation.'" *Bearchild v. Cobban*, 947 F.3d 1130, 1140 (9th Cir. 2020) (quoting *Hudson*, 503 U.S. at 8).

With respect to the subjective component, it is well-established that "the unnecessary and wanton infliction of pain . . . constitutes cruel and unusual punishment forbidden by the Eighth Amendment." *Whitley v. Albers*, 475 U.S. 312, 319 (1986) (internal quotation marks omitted). Nevertheless, prison officials are granted a "wide-ranging deference" in the execution of policies and practices they believe necessary to preserve prison discipline and security. *Id.* at 321–22. "That deference extends to a prison security measure taken in response to an actual confrontation with riotous inmates, just as it does to prophylactic or preventive measures intended to reduce the incident of these or any other breaches for prison

7

discipline." *Id.* at 322. "It does not insulate from review actions taken in bad faith or for no legitimate purpose, but it requires that neither judge nor jury substitute their judgment for that of officials who have made a considered choice." *Id.*

When prison officials stand accused of using excessive force in violation of the Eighth Amendment, "the core judicial inquiry is . . . whether force was applied in a good-faith effort to maintain or restore discipline, or maliciously and sadistically to cause harm." *Hudson*, 503 U.S. at 7. Five factors bear on this inquiry: "(1) the extent of injury suffered by an inmate; (2) the need for application of force; (3) the relationship between that need and the amount of force used; (4) the threat reasonably perceived by the responsible officials; and (5) any efforts made to temper the severity of a forceful response." *Furnace v. Sullivan*, 705 F.3d 1021, 1028 (9th Cir. 2013) (internal quotation marks omitted). Thus, it is the use of force itself, rather than the resulting injury, that drives the inquiry. *See Wilkins v. Gaddy*, 559 U.S. 34, 38 (2010) ("Injury and force . . . are only imperfectly correlated, and it is the latter that ultimately counts.").

With respect to the subjective inquiry, Server argues that he had no history with Rodriguez at the time of the incident. Specifically, Server's declaration states that "[p]rior to this incident I had no memorable interaction with Rodriguez." (Doc. 27-4 at ¶ 15.) This account is consistent with Server's summary judgment briefing, wherein he avers that "Plaintiff has not alleged any wrongdoing on the

part of Sergeant Server that did not take place during the struggle to restrain Plaintiff as he actively resisted." (Doc. 26 at 12.)

In response, however, Rodriguez maintains that Server is lying about not knowing him. (*See* Doc. 30 at 1.) In Rodriguez's recitation of events, the discussion immediately preceding the thrown coffee is not Server's mere assertion that Rodriguez is going to lockup, but rather Server laughing when Rodriguez reminds him about an October 2016 incident between the two men when Server yelled at Rodriguez for pressing the intercom buzzer and threatened to come down from the cage and kick Rodriguez's "fucking ass." (Doc. 18 at 1.)

Rodriguez's story is bolstered by Server's "Statement of Incident," which states that Rodriguez said something along the lines of "I've hated you since 2016." (*See* Doc. 27-4 at 13.) Rodriguez maintains that "Server always direspected [sic] me always with foul language c/o Server always carryed [sic] himself the same with all other Inmates." (Doc. 30 at 2.) Thus, the record at this stage does not undisputedly show there was no "bad blood" between the two men. *Compare with Cummings v. Borges*, 2012 WL 4022682, at *6 (C.D. Cal. July 9, 2012) (finding no evidence of malicious or sadistic intent on behalf of prison staff where inmate "does not allege prior confrontations or 'bad blood'"). Even so, the facts, viewed in the light most favorable to Rodriguez, compel a finding that Server's actions were a "good-faith effort to maintain or restore discipline," not

9

actions taken "maliciously and sadistically to cause harm." *Hudson*, 503 U.S. at 7.

Under *Hudson*, the extent of the injury may provide some indication of the amount of force applied and whether it was necessary. *See Wilkins*, 559 U.S. at 37–38. Here, Rodriguez claims he lost circulation and his wrists were scarred when the handcuffs were put on too tightly. (*See* Doc. 7 at 5.) Rodriguez also claims that his right shoulder and elbow were pulled out of the socket either when his arms were "chicken winged" behind his back or when he was pulled to his feet by his arms, causing injuries that now require cortisone injections and, ultimately, surgery. (*See id.*) His medical records support his allegation of continuing pain in his right arm following the incident. (*See generally* Doc. 18-1 at 21.) Rodriguez's medical records indicate he was life-flighted to Providence Health in July 2020 for a traumatic brain injury sustained during an altercation with another inmate. (*See* Doc. 19.) As it relates to the present incident, however, Rodriguez specifically states that he avoided hitting his head when he fell. (*See* Doc. 18 at 6; Doc. 30 at 3.)

Rodriguez's injuries are enduring and directly related to the officers' attempt to handcuff him. Put differently, there is no evidence that Rodriguez was "gratuitously beaten" beyond the efforts taken to restrain him. *See Wilkins*, 559 U.S. at 38. Rodriguez's injuries therefore do not support a finding that Server used excessive or unreasonable force. As to the need for the application of force,

Rodriguez admits that he and Server exchanged words, he threw his coffee in Server's face, and he kicked Server as he fell backwards. (*See* Docs. 18, 30.) Rodriguez neither confirms nor denies that he resisted in any other way. He pled guilty during the administrative process wherein Server alleged that Rodriguez "punched and kicked [Server] until he was restrained." (Doc. 27-4 at 12.) But even if Rodriguez's resistance is not considered, his undisputed conduct established the need for application of force. *See Cummings*, 2012 WL 4022683, at *5 (finding handcuffing was necessary after inmate "refused direct orders to go to his cell, to lock up and to cuff up").

The next *Hudson* factor is the relationship between the need for the application of force and the amount of force used. 503 U.S. at 7. The officers grabbed Rodriguez's arms before taking him to the ground. (*See* Doc. 27-4 at ¶ 8.) Server then pulled Rodriguez's hands behind his back and handcuffed him, (*id.* ¶ 9), before pulling him back to his feet, (*id.* ¶ 11). Significantly, Rodriguez makes no allegation that any of the officers used any additional force after he was handcuffed.

Rodriguez indicates that two pairs of handcuffs were used during the incident: one by Shulman and Matter before he fell and one by Server after he fell. (*See* Doc. 7 at 5; Doc. 18 at 2.) That narrative is internally inconsistent, however, as Rodriguez indicates his hands were "criss crossed against [his] chest" and

cuffed before being "chicken winged" behind his back and cuffed. (*Compare* Doc. 18 at 2 *with* Doc. 30 at 3.) Even if Shulman and/or Matter was able to put a cuff on Rodriguez prior to his fall, he could not have been fully restrained if Server was immediately able to cuff him behind his back. Even crediting Rodriguez's allegations that multiple handcuffs were used, (*but see* Doc. 27-3 at 3 (Matter indicating only one pair of cuffs was used)), Rodriguez was not fully restrained until the second set of cuffs was on him. These facts do not establish that more force was applied than necessary to effectuate the maintenance and restoration of order.

The fourth *Hudson* factor is the threat reasonably perceived by the defendant. 503 U.S. at 7. Rodriguez concedes that he had a verbal altercation with Server and then threw his coffee in Server's face. It remains disputed whether Rodriguez stepped toward Server aggressively after he threw the coffee, (*see* Doc. 27-5 at ¶ 3), or was in the process of stepping back, (*see* Doc. 18 at 2), Server reasonably perceived a threat of physical resistance, satisfying the standard that he believed force was necessary. Rodriguez maintains that the coffee he threw was "cold" as opposed to "hot." The temperature of the coffee does not change this calculus because Rodriguez committed an assault either way.

The final *Hudson* factor asks whether efforts were made to temper the severity of a forceful response. 503 U.S. at 7. Given the level of force used here—

handcuffing—the only less-severe option may have been not to take Rodriguez to the ground. Rodriguez's own factual allegations indicate, however, that he "fell down backwards" after he was grabbed by the officers. (Doc. 18 at 2.) The undisputed facts do not support a finding that the forced him down. Once down, however, Rodriguez does allege that Server "lunged" on top of his back, (*see id.*), and that Server placed his knee on Rodriguez's back while handcuffing him, (*see* Doc. 30 at 3). Neither action exceeded the bounds of Server attempting to handcuff Rodriguez.

Finally, a number of records submitted by Rodriguez insinuate that his mental health issues played a role in the incident, which would bear on how prison staff responded. To be sure, Rodriguez suffers from mental health issues and was participating in routine mental health visits at the time of the incident. (*See* Doc. 22.) According to his records, however, while Rodriguez was suffering from depression and had trouble sleeping, he was on medication and "functioning fine on the current unit." (*See id.* at 16 (September 2019), 17 (June 2019).) Rodriguez attributes his tossing of his coffee to his "panicked" reaction based on prior trauma, (*see* Doc. 18 at 2), that explanation did not make the act itself any less threatening. Ultimately, neither Rodriguez's mental state nor the circumstances of the incident itself indicate some sort of alternative crisis intervention—as opposed to restraint—was warranted.

13

The record evidence, viewed in the light most favorable to Rodriguez, shows that Server acted in "good faith," and not "sadistically for the very purpose of causing harm." Server had a reasonable belief that Rodriguez's conduct posed an imminent threat to staff safety and institutional order, and his reaction signaled a clear penological goal of deescalating the situation and taking control of Rodriguez. Server was dismissive of Rodriguez's concerns before the coffee being thrown. Nothing in the record suggests that he acted merely to cause "wanton pain and suffering." Summary judgment is therefore granted in favor of Server.

## CONCLUSION

1. Based on the foregoing, IT IS ORDERED that Server's motion for summary judgment (Doc. 25) is GRANTED.

2. This matter is DISMISSED. The Clerk of Court is directed to enter judgment in favor of Server and close the case file.

DATED this 5th day of April, 2023.

*/s/ Brian Morris*

Brian Morris, Chief District Judge
United States District Court